UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-22572-CIV-KING

EMMA YAIZA DIAZ; JOHN A. LANMAN;
AMERICAN FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL ORGANIZATIONS;
AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO;
 FLORIDA PUBLIC EMPLOYEES COUNCIL
79, AFSCME, AFL-CIO; AND SERVICE
EMPLOYEES INTERNATIONAL UNION,

       Plaintiffs,

v.

SUE M. COBB, Secretary of State of Florida;
BRENDA C. SNIPES, Broward County Supervisor
of Elections; JERRY HOLLAND, Duval County
Supervisor of Elections; LESTER SOLA,
Miami-Dade Supervisor of Elections;
BILL COWLES, Orange County Supervisor of
Elections; and ARTHUR ANDERSON,
Palm Beach County Supervisor of Elections,

       Defendants.

_____/

**DECLARATORY DECREE,
FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW</u>**

The deadline for registering to vote in Florida elections and whether it violates the

Constitution and laws of the United States and the State of Florida, is the issue of this

case.

Those persons who did not file a completed application prior to the 29-day

deadline required by Florida Statute § 97.055 are barred from voting on election day.

Plaintiffs submit, that this deadline for registering to vote violates the United

States Constitution by not permitting first-time registrants to correct errors and omissions in their application after the deadline for closing the voting registration books, at any time up to a day prior to the election.  Plaintiffs urge the Court to mandate a "grace period" permitting them, after the deadline to register for an election had passed and the voter roll books of eligible voters are closed, to submit corrections to their incomplete applications (filed prior to the statutory deadline) and to have these corrections of their errors and omissions be processed (by Defendants) as timely filed applications.  This would result in requiring the names of those persons to be added to the rolls of eligible voters after the deadline had passed.

The Secretary of State, and the 67 supervisors of election in the respective counties across Florida, defend the constitutionality of the deadline, asserting that the registration deadline promotes a legitimate state objective, namely;  the orderly, accurate, and reliable administration of elections.  Defendants further assert that, in the hectic and tumultuous weeks before an election, the registration deadline is absolutely essential to enable election officials to give due attention to the countless number of mandated essential tasks imposed on them by federal and state law, by candidates and voters, by unforeseeable contingencies, and by the pressing necessities of election administration.

## I. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States; under 28 U.S.C. § 1343(a)(4), as a case to recover damages or to secure equitable or other relief under any Act of

Congress providing for the protection of civil rights, including the right to vote; and under

28 U.S.C. § 1367 granting supplemental jurisdiction over related claims.

Plaintiffs' prayer for declaratory and injunctive relief is authorized by 28 U.S.C.

§§ 2201 and 2202; 42 U.S.C. § 1973gg-9(b); and Rules 57 and 65 of the Federal Rules of

Civil Procedure.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendants Lester Sola, Miami-Dade County Supervisor of Elections; Brenda Snipes,

Broward County Supervisor of Elections; and Arthur Anderson, Palm Beach County

Supervisor of Elections reside in this District.

## II. FACTUAL BACKGROUND

Individual Plaintiffs Diaz and Lanman registered to vote in the fall of 2004.

Plaintiff Diaz was informed orally on October 6, 2004, and in writing two days later, that

her application had been rejected for failure to check the box on the application affirming

that she had not been adjudicated mentally incapacitated.  Plaintiff Lanman alleges that

he has received no communications from the Orange County Elections Supervisor

concerning his application, but that county records indicate that his application was

rejected for failure to check the boxes on the application affirming that he had not been

convicted of a felony and had not been adjudicated mentally incapacitated.

The Organization Plaintiffs allege that several of their members' voter applications

were improperly rejected in 2004, on the basis of failure to check one or more boxes.

3

Sue M. Cobb was the Secretary of State of Florida in January 2006.[1]  The Secretary of State is the chief elections officer of the State of Florida and has responsibility for general supervision and administration of election laws.  Fla. Stat. § 97.012 (2005) & (2006).  She is sued in her official capacity for her actions taken under color of state and federal law.

Defendants Brenda Snipes, Jerry Holland, Lester Sola, Bill Cowles and Arthur Anderson are Supervisors of Elections for Broward, Duval, Miami-Dade, Orange and Palm Beach Counties, respectively.  They are sued in their official capacities in connection with their actions taken under color of state and federal law.

In 2004 and 2005, Florida Election Supervisors were responsible for maintaining voter registration books and for ensuring that all voter registration and list maintenance procedures in that County were in compliance with the Voting Rights Act.  *See* Fla. Stat. §§ 97.012(11) and 98.015 (2004) & (2005).

As of January 1, 2006, Supervisors became responsible for updating voter registration information, for entering new voter registrations into the new statewide voter registration system, and for ensuring that all voter registration and list maintenance procedures in each County complied with the Voting Rights Act, the NVRA, the Hep America Vote Act of 2002, and the rules issued by the Secretary of State.  Fla. Stat. § 98.015 (2006).

---

[1]  Glenda Hood, Secretary of State in 2004, when suit was filed, was succeeded by Sue M. Cobb, who was succeeded by Kurt S. Browning.

4

### III.  **PROCEDURAL BACKGROUND**

On October 12, 2004, three weeks before the November 2, 2004, general election, Plaintiffs filed their initial Complaint challenging the denial of their voter applications and seeking injunctive relief.  Defendants Palm Beach County, the Secretary of State, Broward County, Miami-Dade County, and Orange County, filed separate Motions to Dismiss on October 19, 2004.  Oral argument on the Motion for Preliminary Injunction was heard October 22, 2004.  Since the issues raised, and the relief sought, could have seriously impacted the national (and state) election set a few weeks later, the Court addressed the issues on an extremely expedited basis.  (Order on Case Management, October 20, 2004.)  With great cooperation, from all lawyers on both sides, the Motions (filed daily) were responded to within a few days, hearings with oral argument were held promptly (every few days), and the injunctive aspect of the case reached timely.

Two weeks later, this Court entered an Order dismissing the complaint for lack of standing, "without prejudice to file an amended complaint."[2]  Plaintiffs elected not to exercise their right to file an amended complaint, but sought appellate review by filing a Notice of Appeal the next day.

Eleventh months later, on September 28, 2005, the Eleventh Circuit Court of Appeals vacated this Court's dismissal[3] (with leave to amend) on the issue of standing,

---

[2]  October 26, 2004 (D.E. #82)

[3]  The brief opinion, quoted in its entirety, states: "In this case, the district court dismissed Appellants' Complaint on the grounds that Appellants lacked standing to sue.

noting that the Florida Legislature had changed the law pertaining to voter registration in Florida while the case was on appeal, and directed the Plaintiffs to file an amended complaint "taking into account the law as it presently exists."

By this opinion, the Eleventh Circuit has decided Plaintiffs have the requisite standing to bring this case. That issue, having been resolved by the Court of Appeals is no longer pending for further consideration by this Court. Counsel for both sides, nevertheless, brief, argue and seek yet another adjudication on standing. (Pls. Memo., pp. 16-19, 2/11/08; Defs. Memo., pp. 20-23, 2/10/08) The issue, having been rendered moot by the appellate decision of September 28, 2005, (FN2, *supra*, p. 5) will not be addressed in this opinion, even though the parties treat it as an issue the Court should again reconsider.[4]

Despite the clear language of the Opinion of the Eleventh Circuit, no action was taken to file an amended complaint or, by either side, to move the case forward, for the ensuing five months. In spite of the fact that another election was set for September 5, 2006, nothing happened until March 10, 2006 when the Secretary of State filed a Motion (granted the same day) for status conference.

_____

The district court erred in this conclusion. However, the parties have noted that the Florida law pertaining to voter registration relevant to this case has been amended during the pendency of this appeal. The district court judgment is VACATED and the case REMANDED for further proceedings including the filing of an amended complaint, taking into account the law as it presently exists."

[4] See, Order Dismissing Complaint Without Prejudice to Amend October 16, 2004 (D.E. #82) pp. 10-17 discussing this Court's reason for holding Plaintiffs did not have standing.

At the scheduling conference on March 27, 2006, the Court heard oral argument and granted, pursuant to the Appellate Mandate, Plaintiffs' *ore tenus* motion to amend the complaint.

The Second Amended Complaint filed May 17, 2006 alleged that Defendants' declination to register applicants who failed to complete their registration applications by checking boxes on the State-provided form, where such information is conveyed elsewhere on the form, violates the Materiality Provision of the Voting Rights Act (VRA) (Count I); that not registering people who failed to provide information on a state voter registration form while registering people who used a federally mandated form that did not request the same information violates the Uniformity Provision of the VRA (Count II); that not registering applicants who failed or will fail to check boxes seeking what Plaintiffs contend to be redundant information, on applications that were allegedly confusing and ambiguous, requiring applicants to undergo what Plaintiffs characterize as the equivalent of a literacy test, and further, not timely notifying applicants of omissions and/or failing to provide a grace period, all violate the Due Process Clause (Counts III & IV); that Defendants are maintaining and administering non-uniform methods and practices of administering elections in violation of the Equal Protection Clause (Count V); that the text accompanying the mental capacity checkbox constitutes a literacy test prohibited by the VRA (Count VI); and that the State's voter registration form violates the National Voter Registration Act (NVRA) by requiring duplicate information and/or information beyond the minimum "necessary to enable State election officials to assess

7

the eligibility of the applicant" (Count VII).

After briefing, and oral argument on May 31, 2006, Defendants' Motions for a
More Definite Statement and to Dismiss were granted in part by this Court's Order of
June 20, 2006 (D.E. #167) wherein Counts I, II, VI, and VII were granted by dismissal
with prejudice and a requirement that Plaintiffs file a more definite statement within
twenty (20) days. This was promptly followed by the filing of the Third Amended
Complaint on July 10, 2007 (D.E. #170).

Defendants' Motions to Dismiss the Third Amended Complaint filed August 14,
2006 (D.E. #176) was orally argued on November 17, 2006. This Court's extensive
Order of January 27, 2007 denying and granting in part these Motions[5] was entered
February 27, 2007 (D.E. #201).

Since the Court issued its February 27 Order, the Supervisor of Elections from
Broward, Duval, Miami-Dade, Orange and Palm Beach counties settled with Plaintiffs
and have been dismissed from this action (D.E. #s 278, 300). The Court retains
jurisdiction over these parties, however, for the purposes of enforcing any declaratory and
injunctive relief ordered. (*Id.*) The only remaining Defendant in this action is Kurt

---

[5] Plaintiff Diaz' claim for injunctive relief is DISMISSED as MOOT. Plaintiffs' claim
against Defendants for lack of timely notice to cure deficient applications was
DISMISSED with prejudice for failure to state a claim upon which relief can be granted.
Plaintiffs' claim against Defendants for requiring voters to check a mental capacity
affirmation was DISMISSED with prejudice for failure to state a claim upon which relief
can be granted. It is further ORDERED and ADJUDGED that Defendants shall, within
30 days, answer Plaintiffs' Claim against Defendants for their failure to provide a grace
period after the registration cut-off.

8

Browning, Florida's Secretary of State.  Defendant opposes Plaintiffs' requested relief.
Plaintiffs Emma Diaz and John Lanman were dismissed in Orders of February 27, 2007
(D.E. #201) and July 30, 2007 (D.E. #263).

## A. Legal Standing

Trial was held, commencing February 5, 2008, over a 5-day period through
February 11, 2008.  The trial was conducted with full opportunity for all parties to
present relevant witnesses and testimony concerning relevant and controlling issues as
raised in the pleadings.  Although the contested issue of standing to sue[6] of the
organizational plaintiffs had been timely raised by Defendants, throughout all of the
several filed Complaints alleging that Plaintiffs indeed had such standing, had not been
ruled upon by the Court at the commencement of the trial, Plaintiff had every opportunity
to present whatever evidence they wished to present just as though they had obtained a
favorable ruling on this issue from the Court prior to trial.  Stated differently, all relevant
factual evidence pertinent to the Plaintiffs (or Defendants) was permitted to be introduced
just as though they had full standing to sue.  Plaintiffs thereby gained every right they
would have gained had they received a definitive ruling in their favor on this issue prior
to trial.  The Defendants may have been harmed, should they have obtained a favorable
ruling in their defense on the issue of standing to sue, in that they had to defend a trial
without a resolution of this issue.  By proceeding, to conduct the trial as the Court

---

[6]  See FN2, p. 5, *supra* for statement of mootness of the standing issue at this stage of the
case.

required the parties to go forward, Defendants did not waive any issue they may have regarding standing on any appeal hereinafter filed.  As a practical matter however, the matter is rendered moot by this decision.  Plaintiffs were not hurt, as they gained the right to present whatever evidence they wished to present to sustain the allegations of their Complaint and the Defendants were not harmed (except for the extra burden of defending) since the constitutionality of the ordinance was sustained thus rendering the entire matter moot.

## IV. <u>CREDIBILITY OF WITNESSES</u>

Nineteen witnesses testified in this case.  The Court finds that all nineteen were good people who appeared and testified to the best of their recollection from the events that occurred with reference to holding elections in various counties around Florida during the period of 2004-2007.  The Court found no substantial conflict or anything that would impeach the general credibility of any of the witnesses.  While there may be some minor differences on some matters, the witnesses who testified with respect to the facts of this case did so honestly and properly on both sides.  Some of these witnesses expressed lay opinions as to what they believed or what they thought they were doing.  These opinions are not part of the Court's findings of fact to the extent that the Court can separate them from facts.  The Court makes findings only of facts and disregards the lay opinions of the witnesses as to whether or not they, if ordered by this Court could eliminate the deadline for applications and their interpretations of Fla. Stat. §§ 97.053, 97.055.

10

## V.  **FINDINGS OF FACT**

1.  Four members of the Plaintiff-unions testified that they were eligible to vote; filled

    out, signed and submitted their applications prior to the close of books;

    subsequently learned that their applications were incomplete because of

    inadvertent mistakes; then submitted corrected applications; but could not vote in

    the election for which they intended to register, because the correction came after

    the close of books.  (Thompson, 2/5:A.M.) (Veal, 2/7:A.M.) (Nickens, 2/7:A.M.)

    (Brown, 2/8:A.M.)[7]

2.  Supervisors of Elections from several counties testified that many applicants who

    submit incomplete applications just before book closing did not receive notice in

    time to correct their applications in time to vote in the election for which they

    intended to register.  (Anderson, 2/7)

3.  In the four weeks prior to the close of books before the November 2006 election,

    11,005 voter registration applications were submitted to Florida election officials

    that were determined to be incomplete.  Data summaries in evidence show that in

    2006, there were several hundred applicants who submitted timely applications but

    received notice after the close of books that those applications were incomplete.

    (Defs. Ex. #44)

---

[7] Citations to the transcript refer to the reporter's real-time rough draft and designate the
date (*e.g.*, "2/5" for February 5) and page number of morning (A.M.) or afternoon (P.M.)
session of trial.  The Court does not have a certified full transcript available and did not
want to delay the opinion for one to be transcribed.

4.  Prior to the enactment of the National Voter Registration Act (NVRA) in 1993, voter registration in Florida (with limited exceptions) had to be effected by the applicant coming in person to the headquarters office of the registrar and filling out the application before the county registrar. Thirty thousand persons came to the Leon County Headquarters in three weeks immediately prior to the 1992 election in Florida for this purpose. (Bradshaw, 2/8:A.M., P.M.)

5.  Currently, voter registration in Florida is simpler, more convenient and efficient than it was in the past. It can be accomplished in a number of different ways by anyone desiring to vote. The method most commonly used is to fill out the registration form at the Department of Motor Vehicles and Highway Safety (DHSMV). (Sancho, 2/5:118) Whenever a citizen visits a DHSMV office to apply for, or make changes to, his driver's license, the DHSMV official prompts the applicant regarding voter registration. (Sancho, 2/5:171-72) Registration takes approximately 10 minutes of applicant's time. (Sancho, 2/5:P.M.) The "Motor Voter Law" established the same registration form for all 67 counties in Florida. The new process (registering at DHSMV) eliminated "thousands of applicants appearing at the headquarters of the supervisors just prior to election." (Sancho, 2/5:P.M.)

6.  Voter registration applications are also available through other state agencies, including state welfare offices, public libraries (Hollarn, 2/8:89) and local community businesses. (Sweat, 2/6:72)

7.  Supervisors of Elections throughout the state regularly conduct voter outreach and voter registration drives, encouraging all eligible Floridians to register to vote. (Sweat, 2/6:71) (Sancho, 2/5:141)  On the voter registration drives (conducted by the county supervisors) staff  emphasize during instruction to voters, that <u>a correct application to vote requires the filling out of all blank spaces on the form</u> (Defs. Ex. #7) or ". . . it will be rejected!"  (Sancho, 2/5:P.M.)

8.  Supervisors and their staffs are available to assist voters with registration anytime throughout the year.  When a Supervisor's office receives incomplete voter registration applications, they send appropriate notices as soon as possible. (Korman, 1:238)  They do not wait for any response from the Florida Voter Registration System (FVRS) before doing so.  (Sancho, 2/5:179)

9.  Florida currently has approximately 12.4 million registered voters.  (Bradshaw, 2/8:37)

10.  Following the enactment of the NVRA, many voter registration applications are collected by third-party groups, which frequently hoard applications, delivering them at the last moment.  (Korman, 2/5:237) (Sweat, 2/6:87) (Snipes Depo, 32) (Tanko Depo, 48).

11.  The holding back of applications that have been signed by persons desiring to register to vote when collected by third-party groups such as representatives of defendant labor unions or other public spirited interested groups (as opposed to registration supervisor personnel) is referred to in the testimony as "bundling" or

13

"grouping" of applications.  The actions of such third-party individuals in holding the registrations back in "bundles" or "groups" until the last day prior to the book closing deadline is an incredible imposition on the supervisors and their staffs to complete the voter registration rolls prior to election day.  It is almost susceptible to an interpretation that some third-party groups have held back the applications for the purpose of disruption of the fair voting process mandated by Florida and federal law.  At a minimum, it is a thoughtless, inconsiderate disruptive practice; at a maximum, it can frustrate the whole election process.  (Kolodney, 2/6:P.M.)

12.     In 2004, Miami-Dade County received approximately 10,000 applications immediately before the book-closing deadline.  (Korman, 2/6:25)  Many of these were signed by the applicants months before their submission.  *Id.* at 27.  In 2004, Hillsborough County received a single delivery of 27,000 applications on the book-closing date.  (Johnson, 2/6:49, 65)

13.     In 2004, Broward County received over 20,000 applications on the book-closing deadline, most of which were from third-party groups.  (Kolodney, 2/6:149) (Snipes Depo at 35)  The office could not handle them all, had to employ additional workers, and required fifteen days to process them all.  (Kolodney, 2/6:152)

14.     When the office is busy, such as leading up to a presidential election, a Supervisor's office may require the entire 13-day period permitted by law to input

and process all applications received before the book-closing deadline. (Korman, 2/5:234)

15. In 2004, Miami-Dade County was forced to set aside many applications that were received after the close of books because of time limitations. (Korman, 2/6:27) Manatee County likewise holds late-submitted applications until after the election for processing. (Sweat, 2/6:75) Out of necessity, Broward County was also forced to give priority to those that were received timely. (Kolodney, 2/6:154) (Snipes Depo, 134-34) Duval County similarly sets aside late applications until after the election. (Bedini Depo, 79-81)

16. Data entry and related processing requires between five to ten minutes for a single voter registration application. (Sancho, 2/5:101) (Bedini Depo, 52)

17. The last sixty days before an election (including the twenty-nine-day book closing period) are the most tumultuous times in a Supervisor's office. During this time, officials must review, process, and input the substantial volume of voter registration applications that are received shortly before the book closing period. They must prepare for and conduct early voting, which begins fourteen days after the book-closing deadline. They must review and respond to thousands of absentee ballot requests. They must recruit and train poll workers. They must respond to an increased volume of telephone and other inquiries from candidates and the voting public. They must process address and other changes of registered voters. They must prepare polling places, including addressing security needs.

15

They must prepare and test voting equipment and plan for its distribution.  They

must distribute election day materials, including ballots.  They must prepare,

assemble, and deliver precinct registers.  In addition, they must address any

contingencies that may arise.  (*See generally* testimony of Cowles, Hollarn, Sola,

Korman, Snipes, Bedini and Bradshaw.)

18.  The atmosphere in the Miami-Dade Supervisor's office during this period is

pandemonium.  (Korman, 2/6:34)  During that same period for the January 2008

Presidential Preference Primary, the office processed 60,000 constitutional

amendment petitions.  The period is intense, stressful and frantic because the

election is inflexible and cannot be postponed.  (Sola, 2/6:108) (Bradshaw,

2/7:A.M.)  The office is preparing for early voting, mailing absentee ballots, and

making other preparations.  (Sola, 2/6:108)  During the most recent book-closing

period, the office processed approximately 65,000 absentee ballot requests.  (Sola,

2/6:120)

19.  The Manatee County Supervisor of Elections' office has inadequate resources to

handle its current voter registration duties.  (Sweat, 2/6:72)  Its Supervisor of

Elections does not trust the quality of temporary employees to handle issues

relating to voter registration.  *Id.* at 73.

20.  When applicants submit corrected applications, they often do so on a new form.

Therefore, officials are unable to determine whether an application is a new

application or a correction until they process the application.  (Korman, 2/5:252) (Kolodney, 2/6:131, 147)

21.   Miami-Dade County alone has 749 precincts.  (Korman, 2/6:29)  It employs approximately 10,000 poll workers.  (Sola, 2/6:103)  The county has a population of approximately 2.7 million, with approximately 1,085,000 registered voters. (Sola, 2/6:106)  For the August 2008 primary, the office plans to prepare over four million blank ballots for the new optical scan voting system. (Sola, 2/6:111)

22.   Approximately 67,000 voters utilized early voting in Miami-Dade in the January 2008 election.  Typically, approximately 20-30% of voters cast their ballots early. (Sola, 2/6:114)

23.   Both early voting and absentee balloting contribute substantially to the workload of the Supervisors of Elections Offices.  (Sola, 2/6:120)

24.   An intense effort is made by all County Supervisors to ensure all new applications are processed before early voting begins.  (Sola, 2/6:105)

25.   Supervisors of Election rely on the book closing deadline in preparation for early voting.  (Sola, 2/6:115)  They endeavor to ensure that all new applicants are able to vote on the first day of early voting, which is just fourteen days after the book-closing deadline.

26.   Supervisors of Election also rely on the book-closing deadline to help prepare for election day.  (Sola, 2/6:116) (Cowles Depo, 151).  They use the knowledge of the number of registered voters to assign poll workers and equipment to the various

precincts.  (Sola, 2/6:116) (Hollarn, 2/8:66)

27.    The number of ballots to be delivered to a precinct depends in part on the number of registered voters included in that precinct's boundaries.  (Sancho, 2/5:199)

28.    Miami-Dade County prints its precinct registers approximately two weeks before election day.  It then takes three to four days to assemble the registers of registered voters authorized to vote.  The only supplements to these books (register rolls) made thereafter are to mark the names of individuals who voted early by absentee, and are therefore ineligible to vote on election day.  No new names are added after this time.  (Korman, 2/6:14, 30.)

29.    In Broward County, registers are printed ten days before the election.  (Kolodney, 2/6:157)  Like in Miami-Dade, the supplements do not add names after printing. Instead, they merely mark names of individuals who voted early or by absentee. (Kolodney, 2/6:157)

30.    Any changes to the registration figures would require changes to staffing or changes to allocation of equipment.  (Cowles Depo, 162)  This would also affect the number of bilingual poll workers required under federal law in Orange County. (Cowles Depo, 162).

31.    Supervisors of Election rely on the book closing deadline data to conduct accurate and reliable tests on their voting equipment.  (Hollarn, 2/8:75)  The book-closing report is the basis for the testing that each supervisor conducts to determine the accuracy of the process by which the ballots are cast.  All equipment is tested for

security and accuracy to ensure that the reported returns of the voting are true, accurate and free from fraud. (Hollarn, 2/8:A.M.) The supervisors of elections depend upon the exist book-closing deadline to determine the number of people listed on the rolls at the point in time that the test is done. The accuracy of the book-closing numbers is absolutely essential as a starting point for the testing conducted by the supervisors. (Hollarn, 2/8:A.M.)

32. This early testing is mandated by law and, once conducted and found to be accurate, true and correct, the voting machines (or other process utilized) are locked, sealed and maintained in a very secure posture until distributed to the polling places for use on election day. (Hollarn, 2/8:A.M.) At this point, the entire process is in "an election mode" and high security prevails.

33. Large volumes of late-filed corrections would pose a substantial problem for the Manatee County Supervisor of Elections' office. (Sweat, 2/6:77) During the book-closing period, the office is focused on preparing for an orderly election, including training poll workers, printing roster books, and handling absentee ballot requests.

## VI. **LEGAL STANDARD**

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . ." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos,

19

is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). "To achieve these objectives, States have enacted comprehensive and sometimes complex election codes." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). As a result, "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 434. Each provision, "whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects, at least to some degree, the individual's right to vote." *Anderson*, 460 U.S. at 788.

"Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 434. Rather, a court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* (internal marks omitted). Under this test, "severe" burdens on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, nondiscriminatory[8] restrictions' upon the First and Fourteenth

---

[8] A regulation is nondiscriminatory if it is facially neutral. Thus, in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997), the Supreme Court examined a state

Amendment rights of voters, 'the State's important regulatory interests are generally

sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). Thus,

"[t]he approach used by the *Anderson* Court can be described as a balancing test that

ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances."

*Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992).

    The Supreme Court has not subjected registration deadlines to the strict scrutiny

test. Instead, it has consistently treated them as reasonable, nondiscriminatory

---

law that prohibited a candidate from appearing on the ballot as the nominee of more than
one party. The Court, noting that the prohibition applied to "major and minor parties
alike," concluded that it was reasonable and nondiscriminatory. *Id.* at 360. It did so
despite the tendency of candidates, when forced to choose, to prefer the nomination of a
major party, and the consequent disparate impact on minor parties. *See id.* at 367 ("[T]he
States' interest permits them to enact reasonable election regulations that may, in
practice, favor the traditional two-party system."). By contrast, in *Patriot Party of
Alleghany County v. Alleghany County Department of Elections*, 95 F.3d 253 (3d Cir.
1996), the Court invalidated a state law which, on its face, prohibited minor parties from
nominating candidates nominated by major parties, but not *vice versa*. Unlike the statute
in *Timmons*, that in *Patriot Party* was facially discriminatory. *See id.* at 262 (citing the
Circuit Court decision in *Timmons* and explaining that, while in *Timmons* "minor parties
suffered only from the disparate impact of [an] across-the-board ban," the laws at issue in
*Patriot Party* "discriminate on their face.").
In *Reform Party v. Allegheny County Department of Elections*, 174 F.3d 305 (3d Cir.
1999) (en banc), the Court reaffirmed its decision in *Patriot Party* in light of the Supreme
Court's decision in *Timmons*. *Timmons*, the Court acknowledged, recognized that a state
law is not discriminatory merely because exerts a disparate impact "in practice." The
statute at issue in *Patriot Party*, however, was discriminatory "on its face." *Id.* at 313
n.8. More recently, in *Gonzalez v. Arizona*, 485 F.3d 1041, 1409 (9th Cir. 2007), the
Court sustained a state law that required all voter registration applicants to provide proof
of citizenship, concluding that the challenged regulation was nondiscriminatory because it
"applies to all Arizonans." And in *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1375-76
(S.D. Fla. 2004), this Court refused to apply strict scrutiny to an absentee ballot deadline
that was not "discriminatory on its face."

restrictions subject to a relaxed standard of review.  In analyzing the constitutionality of a registration deadline, the Court explained that the proper inquiry is whether the challenged law imposes "arbitrary time limit unconnected to any important state goal." *Rosario v. Rockefeller*, 410 U.S. 752, 760 (1973).  Indeed, "registration requirements . . . are 'classic' examples of permissible regulation." *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 196 n.17 (1999).

In *Dunn v. Blumstein*, 405 U.S. 330 (1972), the Supreme Court struck down Tennessee's durational residency requirement, but it wrote favorably about registration deadlines.  "The State closes the registration books 30 days before an election to give officials an opportunity to prepare for the election." *Id.* at 347.  The Court did not establish a particular timeframe that would pass constitutional muster, but it approved Tennessee's thirty-day period.  "[Thirty] days appears to be an ample period of time for the State to complete whatever administrative tasks are necessary to prevent fraud, and a year, or three months, too much." *Id.* at 348.

Shortly after deciding *Dunn*, the Supreme Court addressed specific challenges to registration deadlines.  In *Marston v. Lewis*, 410 U.S. 679 (1973), the Court sustained Arizona's fifty-day registration deadline.  Recognizing that "a person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot," the Court explained that states "have valid and sufficient interests in providing for *some* period of time—prior to an election—in order to prepare adequate voter records and protect its electoral processes from possible fraud." *Id.* (emphasis in original). The Court

22

accepted the legislative judgment "that the period is necessary to achieve the State's legitimate goals." *Id.*

The Court next decided *Burns v. Fortson*, 410 U.S. 686 (1973), upholding Georgia's fifty-day registration deadline. Relying on *Dunn* and *Marston*, the Court concluded that "the 50-day period is necessary to promote . . . the orderly, accurate, and efficient administration of state and local elections, free from fraud." [9] *Id.* at 686-87 (quoting district court; ellipsis in original); *see also Beare v. Briscoe*, 498 F.2d 244, 247 (5th Cir. 1974) (acknowledging "the state's right to impose some reasonable cutoff point for registration."). It is clear from these cases that registration deadlines like Florida's are constitutionally permissible.

In *Barilla v. Ervin*, 886 F.2d 1514 (9th Cir. 1989), *overruled on other grounds*, *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170 (9th Cir. 1996), the Court upheld Oregon's 20-day deadline. It did so despite the fact that the 20-day deadline was enacted by voter initiative over the Legislature's preferred one-day period, and despite experimental proof that a shorter period was feasible. And, in *Key v. Board of Voter Registration of Charleston County,* 622 F.2d 88 (4th Cir. 1980), the Court concluded that

---

[9] In the context of primary elections, the Supreme Court has upheld a voter registration cutoff of eleven months. *Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973). There, applicants had to register with a political party three months before a general election to be eligible to vote in the next primary election. *Id.* at 760. The Court noted that "the State is certainly justified in imposing some reasonable cutoff point for registration or party enrollment, which citizens must meet in order to participate in the next election." *Id.* It then concluded that even the "lengthy" period between the enrollment deadline and the next primary election was connected to an important state goal. *Id.*

a 30-day book-closing period which prohibited even duly registered voters from making any corrections to their addresses after the book-closing deadline (thus precluding them from voting) was constitutional. "The statutory requirement that, as a qualification of voting in any election, one must be duly registered on the books of registration . . . at least thirty days before that election has been held perfectly valid and constitutional." *Id.* at 90.[10]

In upholding book-closing deadlines, courts have recognized the difference between regulations that categorically deny the right to vote and those which merely require an applicant to take some action to satisfy reasonable registration requirements. In *Rosario*, the Court sustained a registration deadline and explained that, if an applicant's "plight can be characterized as disenfranchisement at all, it was not caused by [the challenged law], but by their own failure to take timely steps to effect their enrollment." 410 U.S. at 758. Likewise, in *Barilla*, the Ninth Circuit noted that

---

[10] Congressional enactments are also in accord with Florida's registration requirement. In 1970, Congress amended the Voting Rights Act of 1965 to provide that, with respect to presidential elections, state-law registration deadlines may not exceed thirty days. *See* 42 U.S.C. § 1973aa-1(d). More recently, in adopting the National Voter Registration Act of 1993, Congress provided that applicants who submit a "valid voter registration form" no later than the thirtieth day before any federal election must be permitted to vote. *See* 42 U.S.C. § 1973gg-6(a)(1)(A)-(D). Congress did not create a "grace period." Indeed, it recognized the right of states to demand a "valid" form prior to the registration deadline. *See Association of Community Organizations for Reform Now v. Miller*, 912 F. Supp. 976, 987 (W.D. Mich. 1995) (noting that Congress left to states "the task of determining . . . that *the registration form as submitted complies with state law*.") (emphasis added). Congress did not create a "grace period" then, and it did not create a "grace period" with the enactment of the Help America Vote Act in 2002.

applicants who failed to comply with the registration deadline "were all disenfranchised by their willful or negligent failure to register on time." 886 F.2d at 1524. Because the applicants had ample opportunity to register, the burden imposed was not severe and strict scrutiny was not warranted:

> Like Plaintiffs in *Rosario*, the three appellants in this case were not "absolutely disenfranchise[d]" by the challenged provision. They could have registered in time for the March 31, 1987 election, but they failed to do so. What is at issue here is not a "ban" on Plaintiffs' right to vote, but rather, a "time limitation" on when Plaintiffs had to act in order to be able to vote. Accordingly, the burden imposed on these plaintiffs' right to vote is not "substantial" enough to require strict scrutiny.

*Id.* at 1524-25 (citations omitted). The Court accordingly found that "rational basis" applied and concluded that Oregon's book-closing deadline "easily" satisfied this standard. *Id.* at 1525.

Courts have, in similar contexts, analyzed and upheld election deadlines under a relaxed standard of review. In *Burdick*, a voter challenged the constitutionality of a state law that prohibited write-in votes. 504 U.S. at 430. The Court upheld the law, noting that the burden on the right to vote was "very limited" because the state afforded ample opportunities to candidates, prior to a deadline two months before the primary election, to obtain ballot placement. *Id.* at 436-37. The challenged law, the Court explained, simply required voters "to act in a timely fashion if they wish to express their views in the voting booth." *Id.* at 437. Similarly, in *Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004), this Court sustained the constitutionality of Florida's election-day deadline for the return of absentee ballots. Noting that the law "only relates to the mechanics of the

25

electoral process," the Court concluded that "a lesser standard of review" applied. *Id.* at 1375-76. Far from denying the right to vote, the deadline was a "light imposition" on constitutional rights that required nothing more than timely action by voters in furtherance of the public interest in a "fair and honest election." *Id.* at 1377.

Plaintiffs in this case argue that, to the extent exceptions to the book-closing deadline are "feasible" or "doable," they are also constitutionally mandated.[11] The Constitution does not require states to prove that every component of every election regulation is indispensably necessary to avoid either an election catastrophe or an absolute impossibility of performance.[12] It might be <u>feasible</u> to permit voter registration or even voting on the Internet, to process requests for absentee ballots after any deadline, or to leave polls open until 10 p.m. rather than 7 p.m. Each of these changes might allow someone to vote who otherwise would not. But, as the Supreme Court has explained in *Clingman v. Beaver*, 544 U.S. 581, 593 (2005):

> Many electoral regulations, including voter registration
> generally, require that voters take some action to participate
> in the primary process. See, *e.g.*, **2039*Rosario v.*

---

[11] This is not a logical approach. The feasibility of any proposed registration deadline will vary from election to election. A presidential or gubernatorial election, for example, places immeasurably greater strain on election officials than a municipal election or local referendum. It would be impracticable, however, to tailor registration deadlines to the exact limits of feasibility under the infinite and ever-changing variety of possible circumstances.

[12] In fact, it is well established that, in the election context, there is no need for an "elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).

*Rockefeller*, 410 U.S. 752, 760-762, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding requirement that voters change party registration 11 months in advance of the primary election). Election law invariably "affec[t] - at least to some degree - the individual's right to vote and his right to associate with others for political ends." Anderson v. Celebrezze, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

These minor barriers between voter and party do not compel strict scrutiny. See *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result, for it is beyond question "that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons, supra*, at 358, 117 S.Ct. 1364; *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

The question is not whether Plaintiffs' particular proposal is feasible, but whether an important regulatory interest supports the challenged law.

## VII. <u>DISCUSSION</u>

Like many states, Florida has a voter registration deadline. Florida's requirement that registrations be complete twenty-nine days before an election is a reasonable, nondiscriminatory restriction that does not impose severe burdens on the right to vote. By enabling election officials to focus their efforts to critical election tasks in the weeks immediately preceding an election, the Florida's book-closing deadline directly advances the important interest which the state and the public share in orderly and accurate

27

elections.

**A.**      **The Challenged Statute Is a Reasonable, Nondiscriminatory Regulation That Does Not Impose Severe Burdens**

Before 1994, Florida law provided for a "permanent single registration system" which required all voter registration applicants to appear personally before a Supervisor of Elections, a deputy Supervisor of Elections, or a volunteer deputy voter registrar. *See* §§ 98.111 and 98.271, Fla. Stat. (1993). The Florida Voter Registration Act, adopted in 1994 to implement the federal National Voter Registration Act of 1993, greatly liberalized the voter registration process by increasing access to voter registration.[13] Today, Florida provides ample opportunities for all of its citizens to submit completed voter registration applications in a timely fashion.

Florida law requires Supervisors of Elections to distribute applications "in their offices to any individual or group" as well as other designated locations. § 97.052(1)(b)7.a.-b., Fla. Stat. (2007). It requires Supervisors to mail applications directly to any person who requests one. *Id.* § 97.052(1)(b)7.c. It requires offices that provide public assistance or serve persons with disabilities, centers for independent living, and public libraries to make voter registration application forms available. *Id.* § 97.021(40), 97.058(1), (6). It requires the Department of Highway Safety and Motor Vehicles, as a matter of routine, to provide voter registration opportunities in connection

---

[13] Florida law also facilitates voter registration by providing a single, uniform application form, *see* § 97.052(1), Fla. Stat. (2007), a departure from past practice which involved as many different application forms as there were counties in Florida. (2/8:11-12).

with every driver's license transaction. *Id.* § 97.057(1). Upon request, the Florida Department of State must provide applications to armed forces recruitment offices, and all colleges and universities that receive state financial assistance are required to provide each enrolled student with an opportunity to register to vote. *Id.* §§ 97.021(31), 97.052(1)(b)4.-5, 97.0583. Florida law allows "any private individual or group" to reproduce the application form, provided that the reproduction is in the approved format. *Id.* § 97.052(1)(c).

No longer must applications be procured from public officials or their trained and deputized agents. (Tr. 2/8:10-11) Voter registration applications are now widely available in public and private locations, including banks, real estate offices, post offices, and even on the Internet. Election officials send thousands of application forms at a time to third-party groups upon request. (Tr. 2/8:11) In Leon County, voter registration applications are available at over one hundred locations, including all public and private schools, grocery stores, and even a clothing store. (Tr. 2/5:170) The Supervisor of Elections employs an outreach coordinator to assist private groups that conduct voter registration drives. (Tr. 2/5:141) Fifty to sixty voter registration drives take place each year in Leon County, about twelve of which are staffed by the Supervisor of Elections' office. (Tr. 2/5:141) In Manatee County, application forms are available in banks, real estate offices, and in county offices. The Supervisor of Elections works together with the political parties and interest groups, such as the League of Women Voters, to provide support to voter registration drives. (Tr. 2/6:71) Though the law does not require these

29

groups to accept training, each Supervisor offers training to assure the submission of completed forms.

Not only are application forms readily accessible through numerous channels at any time of year, they may be delivered, by mail or in person, to countless locations across the state, such as the Supervisors' offices, the Division of Elections, social service offices, public libraries, and armed forces recruitment offices. § 97.053(1), Fla. Stat. (2007). Election officials continually process applications, entering them into the statewide voter registration database within thirteen days after receipt, *see id.* § 97.053(7), and sending notices to applicants who submit incomplete applications within five business days, *see id.* § 97.052(6). The year-round nature of voter registration, the liberal availability of voter registration applications, the assistance that election officials offer to applicants and third-party groups, the numerous means of submitting completed applications, and the requirement of prompt notice to applicants who submit incomplete applications refute any suggestion that the registration deadline practically burdens the ability of Floridians to register to vote. Florida law provides every opportunity for applicants to effect their registrations long before books close twenty-nine days before an election.

**B.    The Book-closing Deadline Promotes an Important Regulatory Interest.**

The public interest in the maintenance of order in the election process is not only important, it is compelling. *Green v. Mortham*, 155 F.3d 1332, 1334 (11th Cir. 1998). The registration deadline, without an arbitrary exception for individuals who submitted

30

incomplete applications, directly promotes this interest.  In the weeks and even months before an election, the registration deadline provides a certainty and reliability that enable election officials to direct their efforts to the essential tasks of election preparation and thus minimizes the degree of disorder and the risk of error and even chaos.

The undisputed evidence shows that, between the registration deadline and election day, local election officials operate under immense pressure to complete the multitude of critical tasks imposed on them by law and by practice.  First, immediately before the close of books, the number of applications submitted to election officials experiences a dramatic increase.  (Tr. 2/6:74, 105)  Third-party groups that conduct voter registration drives hoard voter registration applications that were completed weeks or months in advance and submit them at once to local election officials at the last possible moment.  (Tr. 2/6:38, 87; Snipes Depo., 32; Tanko Depo., 48) [14]  Supervisor Sweat testified that, in Manatee County, third-party groups "keep the applications in their car for three, four, five weeks" and "flood us at the last minute."  (Tr. 2/6:87)  In 2004, one third-party group delivered 27,000 applications in a bundle to the Supervisor's office in Hillsborough County on the last day of registration in 2004 (Tr. 2/6:65-66), and, on the same day, no fewer than 20,000 applications were delivered to the Supervisor's office in Broward County.  (Tr. 2/6:149, 150; Snipes Depo., 35)  In Miami-Dade County, ten thousand voter registration applications—many of them dated months earlier—were

---

[14]  References to depositions are those for which excerpts were entered into evidence as Defendant's Exhibit 12.

31

submitted immediately before the 2004 registration deadline.  (Tr. 2/6:25-27)  Even the

Division of Elections in Tallahassee received thousands of applications daily before the

2004 general election and the 2008 presidential preference primary.  (Tr. 2/8:19, 40)

Florida law requires election officials to enter the information on each application

into the statewide voter registration database within thirteen days after receipt, *see*

§ 97.053(7), Fla. Stat. (2007).[15]  For a period of five days *after* the book-closing deadline,

election officials continue to receive applications that are treated as timely, so long as

they are postmarked by the registration deadline, § 97.053(4), Fla. Stat. (2007), or were

timely received by voter registration agencies, *id.* § 97.058(6).  Meanwhile, officials must

send notices, within five days after the entry of data into the statewide database, to all

applicants who submitted incomplete applications.  *Id.* § 97.052(6).  In the weeks before

an election, applications received after the registration deadline are frequently set aside

for want of time.  (Tr. 2/6:27, 75, 154; Snipes Depo., 134; Bedini Depo., 79-81)

Besides processing thousands of voter registration applications, election officials

must:

•       <u>Process Absentee Ballot Requests</u>.  Supervisors of Elections in Florida

process thousands of requests for absentee ballots.  (Tr. 2/6:152)  In 2001, the Florida

Legislature made absentee voting available to all voters by eliminating the requirement

that voters seeking to cast an absentee ballot affirm their inability to vote at the polls on

---

[15]  The testimony varies slightly between Supervisor witness on the time to process from "5-8 minutes to 10."

election day, *see* Ch. 2001-40, § 53, Laws of Fla., and, in 2004, Florida abolished the requirement that an absentee voter's signature be witnessed, *see* Ch. 2004-232, Laws of Fla. Today, any person may request an absentee ballot without a reason, even by telephone. *See* § 101.62(1)(b), Fla. Stat. (2007). In connection with the 2008 presidential preference primary, local election officials processed over 600,000 requests for absentee ballots (Tr. 2/8:39), including about 130,000 in Miami-Dade County alone (Tr. 2/6:118-19). Each request requires election officials to determine the voter's proper ballot style, *i.e.*, the correct selection, based on the voter's residence, of federal, state, and local races and ballot measures (Tr. 2/6:119-20) and mail the ballot to the voter. When returned, to collect the ballot and review the validity of the voter's signature before submitting the ballots to the county canvassing board, *see* § 101.68(1), (2), Fla. Stat. (2007).

•  <u>Design, Print, and Deliver Ballots and Sample Ballots</u>. The preparation of ballots is a complex task. A primary election in Okaloosa County, for example, requires more than 300 different ballot styles. (Tr. 2/8:65) The 2008 presidential preference primary required 156 different ballot styles in Okaloosa County because municipalities consolidated their elections to fall on the same day. (Tr. 2/8:65-66) Besides designing the ballots, Supervisors of Elections must ensure that ballots are printed in sufficient numbers. (Tr. 2/6:118) Ballots used in Okaloosa County are printed in Rock Island, Illinois. (Tr. 2/8:64) The proper number of ballots of each ballot style must then be delivered to each precinct to ensure the availability of ballots on election day. (Tr.

2/6:118)  The allocation of ballots to polling places depends in part on the number of voters known to be registered at each precinct.  (Tr. 2/5:199; 2/6:116)  In Miami-Dade County, which contains over one million registered voters (Tr. 2/6:106), Supervisor Sola expects to order about four million sheets of paper to ensure a sufficient number of ballots at all locations at the fall 2008 primary election (Tr. 2/6:111).  The Supervisors must also supply each polling location with sample ballots and must either publish sample ballots in a newspaper or mail them to individual households no later than seven days prior to an election.  *See* § 101.20, Fla. Stat. (2007).

•     <u>Conduct Early Voting</u>.  In 2004, as a convenience to voters, the Florida Legislature formally instituted early voting.  *See* Ch. 2004-252, § 13, Laws of Fla.  Early voting allows any registered voter, beginning on the fifteenth day before an election, to cast a ballot at the main or a branch office of the Supervisors of Elections, or at any other early voting site designated by the Supervisor.  *See* § 101.657(1), Fla. Stat. (2007).  At the 2008 presidential preference primary, Miami-Dade County's twenty early voting sites welcomed 67,000 voters (Tr. 2/6:111-12), and 643,000 voters statewide availed themselves of the opportunity to cast an early ballot (Tr. 2/8:39).  Designating early voting locations, equipping them, stocking them with ballots, and obtaining and training adequate personnel is therefore a relatively new and weighty responsibility imposed on local election officials during the busiest seasons.  (Tr. 2/6:34, 108, 181; 2/8:100)  Supervisor Sola testified that his office relies on the registration deadline to serve as a milestone with respect to early voting, since it enables election officials to know the

34

volume of applications that must be processed in the brief period between the close of books and the commencement of early voting.  (Tr. 2/7:115-16)

•   Select Polling Locations.  Supervisors of Elections must also select and designate polling locations with air-conditioning to preserve ballots and equipment from excessive humidity.  (Tr. 2/8:69)  Each poll must be compliant with the Americans with Disabilities Act to ensure access for disabled voters (Tr. 2/8:69) and must provide sufficient parking for voters.  (Tr. 2/8:69) Facilities for the accommodation of poll workers, such as restrooms and places to store food and medicine (Tr. 2/8:70) are required.  At polling places located on school premises, poll workers must undergo background checks, satisfactory to school officials (Tr. 2/8:71), with security personnel such as off-duty sheriffs (Tr. 2/8:70).  Miami-Dade County alone must provide approximately 550 such qualified polling places.  (Tr. 2/6:29)

•   Hire and Train Temporary Workers and Poll Workers.  In the weeks before an election, the volume of work requires Supervisors of Elections to hire and train temporary workers.  (Tr. 2/6:151)  Supervisor Sweat testified that he has found it "extremely difficult" to train temporary workers and has elected to pay his regular employees at overtime rates instead.  (Tr. 2/6:73)  Election officials must also locate and train thousands of Floridians able and willing to assist at polling places on election day, an increasingly difficult task in some counties.  (Tr. 2/8:27, 68)  The immensity of the task of training poll workers is illustrated by the sheer number of such workers—between 8,000 and 10,000 in each of Broward and Miami-Dade Counties and 6,000 in Palm

Beach County. (Tr. 2/6:103, 127; 3:70)  In Manatee County, poll-worker training lasts four and a half weeks. (Tr. 2/6:79)  In Okaloosa County, the Supervisor's office trains poll workers and professional trainers throughout the book-closing period. (Tr. 2/8:100-01)  Election officials must also make arrangements when poll workers "drop out."  In Okaloosa County, sixty poll workers dropped out in the final week before the 2008 presidential preference primary. (Tr. 2/8:71)  The assignment of poll workers to polling locations turns in part on the number of voters known to be registered in particular precincts. (Tr. 2/6:119)

•　　Allocate and Test Voting Equipment.  Not more than ten days before the commencement of early voting, the Supervisors must perform publicly advertised logic and accuracy tests to determine whether the hardware and software used in the tabulation of votes are functioning properly.  *See* § 101.5612, Fla. Stat. (2007).  Ballots are premarked according to a mathematical formula and entered into the voting system, and the tabulation is examined for errors. (Tr. 2/8:75-76)  Book-closing data, a compilation of data produced by the Division of Elections on the basis of pre-election registration information, are entered into the machines to enable them accurately to perform on election day. (Tr. 2/8:75-77)  The machines are then sealed and secured until they are allocated and delivered to individual polling places (Tr. 2/6:116; 2/8:78).  At the 2008 presidential preference primary, Miami-Dade County deployed about 5,000 voting machines. (Tr. 2/6:110)

•　　Print, Supplement, and Distribute Precinct Registers.  During the book-

36

closing period, Supervisors of Elections print lists of registered voters, known as precinct registers, for placement at each polling place to enable poll workers to identify voters who present themselves on election day.  (Tr. 2/5:158-59)  Precinct registers are printed in Leon County two to three days before an election (Tr. 2/5:157), in Broward County ten days before an election (Tr. 2/6:157), and in Miami-Dade County one and a half to two weeks before an election (Tr. 2/6:15).  Precinct registers are updated by marking voters who have already cast a ballot either by absentee or early voting (Tr. 2/6:13, 30, 157, 161), and are distributed to the appropriate polling location.  The Deputy Supervisor of Elections for Miami-Dade County testified that, about one week before election day, precinct registers are packaged in cases for delivery.  (Tr. 2/6:13)

•  Update Information for Duly Registered Voters.  After the registration deadline, election officials must continue to process updates to the names, addresses, and signatures of duly registered voters.  *See* § 97.055(1), Fla. Stat. (2007).  Such changes can be submitted on a voter registration form at any voter registration agency (Tr. 2/5:119) or even by letter (Tr. 2/6:147-48), and they are effective immediately, enabling a voter who submits a change of address after the registration deadline to cast a ballot in the voter's new precinct (Tr. 2/5:155).

•  Verify Petitions to Amend the Florida Constitution.  During the book-closing period of presidential preference primaries, Supervisors of Elections are also engaged in verifying tens and perhaps hundreds of thousands of petition signatures in connection with proposed constitutional amendments.  The deadline for the submission of

petition signatures in support of proposed constitutional amendments is February 1 of the year in which the election is held, *see* Art. XI, § 5(b), Fla. Const., and the Supervisors of Elections must verify the signatures within 30 days after receipt, *see* Rule 1S-2.0091(2)(a), Fla. Admin. Code.  Like third-party groups that collect voter registration applications, the proponents of petition initiatives frequently hoard petitions and submit them in the period immediately preceding the deadline.  While election officials in Miami-Dade County were preparing for the 2008 presidential preference primary, they were simultaneously inundated with aproximately 100,000 petitions requiring verification.  (Tr. 2/6:34)  The Deputy Supervisor of Elections for Miami-Dade County was "begging people to help," and those who did worked, "overtime every night and Saturdays and Sundays" to perform these mandatory tasks.  (Tr. 2/6:36)  Indeed, Supervisors across Florida were "frantically checking petitions during the month of January."  (Tr. 2/8:27-28)

•     <u>Answer Inquiries by the Public and Candidates</u>.  While performing these tasks, election officials must also remain responsive to the public.  Phone calls to election offices by individual voters regarding polling locations, voter identification cards, candidates, constitutional amendments, and countless other issues increase daily as election day approaches.  (Tr. 2/6:152; 2/8:86, 100)  Walk-in traffic to supervisors' offices also increases "dramatically."  (Tr. 2/8:86, 99)  In addition to inquiries by members of the general public, phone calls and visits by candidates with election-related questions become so frequent that Supervisor Hollarn characterized the relationship

38

between her office and candidates for election as "baby sitting."  (Tr. 2/8:100)

Not only must election officials perform these duties in the whirlwind atmosphere that precedes an election, they are frequently called upon to perform unforeseeable tasks. In 2007, for example, the Florida Legislature prohibited the use of touchscreen voting technology and appropriated more than $27 million to the purchase of new voting systems by the fifteen affected counties. *See* Ch. 2007-30, §§ 6, 11, Laws of Fla.  The new systems must be in place by the fall 2008 primary.  As of the trial in this case, not all counties have even purchased the requisite equipment (Tr. 2/8:33) or begun to train employees in its use.

As the Deputy Supervisor of Elections for Miami-Dade County testified, the intersection of these tasks during the book-closing period results in "pandemonium." (Tr. 2/6:34)  Supervisor Sola testified that, in Miami-Dade County, the atmosphere in election offices during this period is "intense" and "stressful," and employees work long hours and weekends in preparation for an inflexibly scheduled election (Tr. 2/6:108).  Data entry staff are "in a mad frenzy" to enter information from voter registration applications into the statewide database prior to the commencement of early voting.  (Tr. 2/6:105)  In Manatee County, the situation is "hectic."  (Tr. 2/6:77)  Supervisor Sweat, who testified that he does not have adequate staff to "handle [the] voter registration workload," worries that an exception to the registration deadline, if it results in even 200 or 300 corrected applications, would "pose a real problem."  (Tr. 2/6:72, 77)  Supervisor Sola testified that such an exception might interfere with the orderly administration of elections, since his

office is required to balance priorities and additional responsibilities could be performed only "at a cost." (Tr. 2/6:98-99, 104) His deputy testified that an exception to the registration deadline would increase the probability of mistakes. (Tr. 2/6:39) Supervisor Anderson echoed this view, testifying that he would be "very apprehensive" and "concerned" if an exception allowed corrections to applications through the book-closing period in Palm Beach County. (Tr. 2/7:84) He explained that, if corrections numbered in "the thousands," his office's ability to perform this function would be "questionable" (Tr. 2/7:84), and the volume of corrections might unduly burden his office and interfere with other election-related activities. (Tr. 2/7:84-86) And the volume of corrections would most certainly be considerable.[16] Since applicants often submit corrections on original application forms, an exception for corrections would require election officials before election day to review *all* applications submitted after the close of books, rendering the registration deadline meaningless. (2/5:253; 2/6:131-32, 147)

The ability of Supervisors of Elections to fulfill their duties capably and competently depends in great measure on the resources available to them. Each Supervisor's office is funded according to the discretion of the local board of county commissioners. (Tr. 2/8:30-31) There is no statewide formula to determine the budgets of the respective Supervisors of Elections. (*Id.*) Because their offices are funded by

---

[16] Deborah Dion, the political director of the South Florida AFL-CIO, testified that her organization would use Florida's recently amended public records laws to acquire lists of applicants who submitted incomplete applications in order to orchestrate corrections after the registration deadline. (Tr. 2/7:35)

40

counties, Supervisors of Elections are reliant primarily on property tax revenues. (Tr. 2/5:188) Supervisors in small counties, many of which have disproportionately low property values, are frequently underfunded. (Tr. 2/8:31) The Supervisor of Elections for Lafayette County, for example, has no authorized funding full-time staff. (Tr. 2/8:30) With the adoption of constitutional property tax measures, the resources available to Supervisors of Elections have been reduced. Supervisor Sancho has been directed by the Leon County Commission to reduce his expenditures by eight percent. (Tr. 2/5:189)

The evidence presented at trial clearly establishes that the challenged law advances an important state interest. The book-closing period is hectic and chaotic. Critical responsibilities converge at once and visit enormous pressure and stress on all the employees of Florida's Supervisor of Elections. The requirement that voter registration applicants submit complete and correct applications before registration books close on the twenty-ninth day before an election affords certainty and predictability and allows election officials to direct their exclusive and tireless attention to election management and preparation. In doing so, it decreases the confusion and distraction that to some degree already abound of necessity and thereby reduces the risk of error and disorder in Florida's election process.

## VIII.   CONCLUSION

The Florida statutory requirement of the deadline that must be met by voter registration applicants for submitting a complete and correct application on the 29th day before an election is a reasonable, non-discriminatory restriction that advances an

important state interest in the conduct of an honest, fair and orderly election. The challenged registration deadline does not impose a severe burden on the constitutional rights of the citizens of this state. Florida provides an ample opportunity for all its citizens to register to vote well in advance of the registration deadline.

Florida statute section 97.055 complies fully with the mandates of the First and Fourteenth Amendments of the United States Constitution.

For the reasons set forth in the foregoing declaratory decree, the application for injunctive relief set forth in the Third Amended Complaint is DENIED, and the Complaint be, and the same is hereby DISMISSED WITH PREJUDICE.

DONE and ORDERED in chambers at the U.S. Courthouse and the James Lawrence King Federal Justice Building, Miami, Florida this 25th day of March, 2008.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

cc:    See attached Service List

## SERVICE LIST

*Counsel for Plaintiffs:*
Mary Jill Hanson, Esq.
HANSON, PERRY & JENSEN, P.A.
400 Executive Center Drive , Suite 207
West Palm Beach, Florida 33401
Phone: (561) 686-6550

Judith A. Browne, Esq.
Sheila Y. Thomas, Esq.
Elizabeth Westfall, Esq.
ADVANCEMENT PROJECT
1730 M Street, NW - Suite 910
Washington, D.C. 20036
Phone: (202) 728-9557

Judith A. Scott, Esq.
John J. Sullivan, Esq.
SEIU
1313 L Street, NW
Washington, D.C. 20005
Phone: (202) 898-3453

Elliot Mineberg, Esq.
People for the American Way
Foundation
2000 M Street, Suite 400
Washington, DC 20036
Phone: (202) 467-2392

Jonathan P. Hiatt, Esq.
AFL-CIO
815 Sixteenth Street, NW
Washington, D.C. 20006
Phone: (202) 637-5053

Michael Halberstam, Esq.
Thomas Abt, Esq.
Sarah Kroll-Rosenbaum, Esq.
PAUL, WEISS, RIFKIND, WHARTON,
 GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000

Robert Harris, Esq.
Stack Fernandez Anderson
 & Harris, P.A.
1200 Brickell Avenue
Suite 950
Miami, FL 33131
Phone: (305) 371-0001

Manny Anon, Jr., Esq.
FLORIDA PUBLIC EMPLOYEES
COUNCIL 79
3064 Highland Oaks Terrace
Tallahassee, Florida 32301
Phone:    (850) 222-0842

*Counsel for Defendant:*
Peter Antonacci, Esq.
Allen C. Winsor, Esq.
GRAY ROBINSON, P.A.
Post Office Box 11189
Tallahassee, FL 32302-1189
Phone: (850) 577-9090